**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**RANDY M. KEENE,**

       **Plaintiff,**

**vs.**                                  **Case No. 5:09cv192-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Randy M. Keene, applied for disability insurance benefits. His last date of insured status for disability benefits was December 31, 2009. Plaintiff alleges disability due to back and leg pain, with onset on April 7, 2005. Plaintiff was 50 years old at the time of the second administrative hearing (on March 12, 2008), has a ninth

grade education, and has past relevant work as a long haul truck driver, a saw mill

equipment operator, and an automobile mechanic.  The Administrative Law Judge

found that Plaintiff has the residual functional capacity to do a limited range of light

work, cannot perform his past relevant work, but can perform other work as a gate

guard, ticket seller, labeler, photograph finisher, surveillance monitor, and a food and

beverage order clerk, and thus is not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ." 42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified that in 2003, after his back surgery, he returned to work for a short while, but he said that he no longer can work due to pain in his back and legs, sleep apnea, and the effects of his medications. R. 658-659. He said that he has

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm. Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

dizziness and drowsiness, and cannot think clearly due to pain medications. R. 663. He also said that he has trouble with diabetes, and gets "the shakes real bad [and] a lot of dizziness." R. 659. He said that he had diabetic shakes and dizziness three or four times a day. R. 670.

Plaintiff said that he was prescribed a CPAP device[2] for sleep apnea, and at first could not use it because "they had removed so much of my nose [due to skin cancer] until I couldn't use it." R. 661. He said that after healing, he started using his CPAP again. *Id.* Plaintiff said that pain prevents him from getting good sleep at night, and moving around interferes with the CPAP device. R. 663. He said he sleeps no more than two or three hours. R. 668.

Plaintiff said that the pain in his back and legs felt like "a burn and like I get big knots in my back, my lower back, right around the beltline to burn, and then it goes down into my hip and down into my legs." R. 662. He said that his pain medications "takes the edge off" the pain. *Id.* He said he had not done any physical therapy. R. 662-663.

Plaintiff said that he cannot sit for more than 10 or 20 minutes without shifting position. R. 663-664. He said he could comfortably stand only 10 or 15 minutes, and could walk only about 50 to 75 yards. R. 664. He said that he could lift a gallon of milk with two hands. *Id.* He said that one hand no longer had feeling. R. 665.

---

[2] People with obstructive sleep apnea, particularly those who have excessive daytime sleepiness, benefit most predictably from continuous positive airway pressure (CPAP). With a CPAP device, people breathe through a face or nose mask that provides a slightly higher pressure in the airway. This increased pressure props the throat open as the person breathes in. CPAP can be given with or without humidifying the delivered air. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Plaintiff said he usually gets out of bed at 5:00 a.m.  R. 665.  In a typical day, he sits in his recliner, watches television, and lies down.  R. 666.  He said he cannot cook, clean, vacuum, wash clothes, or do yard work.  *Id.*  While he has a driver's license, he does not grocery shop, go to church, or visit friends.  R. 667.  Plaintiff smokes a pack of cigarettes per day.  *Id.*  He has tried to stop several times, on his physician's advice, but has failed to do so.  *Id.*

At the beginning of the evidentiary hearing, Edward A. Griffin, M.D., was called as an expert witness by the Administrative Law Judge.  R. 625.  Dr. Griffin testified that he practices internal medicine.  R. 627.  Dr. Griffin noted that after surgery in May, 2003, Plaintiff had not had physical therapy, and his primary treatment since May, 2005, had been narcotics.  R. 628.  He said that there was no document or evidence showing that Plaintiff had radiculopathy.  R. 628-629.  He noted that a consultative examination by Dr. Banner on July 8, 2005, found diminished muscle strength (4/5) but no muscle atrophy, and some swelling in the legs.  R. 629.  Dr. Griffin noted that Dr. Banner found that Plaintiff had slight limitation of motion of the spine, lacking 20 degrees of forward bending and lacking maybe 10 degrees of lateral flexion rotation.  R. 630.  The sensory examination was normal.  *Id.*  Dr. Griffin noted that Plaintiff had an MRI of the spine before the operation in 2003, and this showed degenerative changes, but Plaintiff had not had a spinal MRI since the surgery.  R. 636.

Dr. Griffin said that Dr. Spence's medical notes (Dr. Spence is Plaintiff's treating physician) contained "filler," with "very little detailed historical information."  R. 630.  He observed that Dr. Spence did not document radiculopathy, or any motor or sensory

deficits, and his treatment had largely been narcotics.  *Id.*  He said that narcotics

compounded the second problem, obstructive sleep apnea.  *Id.*  Dr. Griffin said that

"[t]he [lack of] documentation of any objective findings in this record on exam, in my

opinion, don't support the long term use of sustained narcotics."  *Id.*  Dr. Griffin

confessed that he was very conservative about narcotics.  *Id.*  Again mentioning sleep

apnea, Dr. Griffin said that he thought that narcotics were doing Plaintiff more harm than

good.  R. 631.  He also said that "initially" Plaintiff had "very poor compliance with his

CPAP."  *Id.*  He said:

> That will compound any constitutional symptoms he might complain of
> during the day, and can lead to problems with mood disturbance and non-
> exertional limitations during the day that would not be expected to last
> were he fully compliant with the CPAP.

*Id.*  Dr. Griffin said that any mood disorder that Plaintiff suffered should be resolved if he

were compliant with use of the CPAP.  R. 640.  He said that the CPAP has to be used

every night for the whole night.  R. 631.  Dr. Griffin said that the surgery to remove basal

cells on Plaintiff's nose would not have prevented him from wearing the CPAP device.

R. 632.  He had not seen photographs of Plaintiff's nose, but based his opinion upon the

experience of his own patients.  R. 633.  He said that he was familiar with the Mohs'

surgical technique[3] that had been used, and Plaintiff "would have been precluded from

wearing his CPAP only during the time the graft was healing."  R. 634-635.  Dr. Griffin

said that if Plaintiff had become fully compliant with CPAP, he could be reevaluated.  R.

649.

---

[3] Mohs' micrographic surgery is a surgical procedure for removal of skin cancer.
American College of Mohs Surgery, found at:  http://www.mohscollege.org/about/.

Dr. Griffin said that while Plaintiff has diabetes, there was no report in the record of "A1C's" or "ACCU checks." R. 633. He noted that the record said that Glucophage[4] had been discontinued due to side effects, but the side effects were not recorded. *Id*. Dr. Griffin said that he had no information as to whether Plaintiff's diabetes was adequately controlled. R. 639.

Dr. Griffin noted the residual functional capacity assessment of Dr. Spence, "which is unsupported by his records." R. 633-634. He said that Dr. Spence mentioned peripheral neuropathy, but there was no notation elsewhere in the records to support a finding that Plaintiff has peripheral neuropathy. R. 633. He noted that Dr. Spence had never done a neurological examination for Plaintiff, and Dr. Griffin could not see how Dr. Spence could "arrive at a diagnosis of peripheral neuropathy" without a neurological examination. *Id*.

Dr. Griffin thought that Plaintiff had the residual functional capacity to occasionally lift 20 pounds and to frequently lift 10 pounds. R. 636. He said that Plaintiff would need to stand or sit at hourly intervals, but could stand or sit six hours out of eight, and could sit six hours out of eight. R. 637. He thought that Plaintiff could stand and walk four hours out of eight. *Id*. He said that Plaintiff was unable to cope with ladders, scaffolding, or heights. *Id*. Dr. Griffin explained:

> It is reasonable to expect that a patient who has had decompressive
> surgery without fusion in two levels of his lumbar spine with no evidence of

---

[4] Glucophage and Glucophage XR are used to treat type 2 diabetes. Regular Glucophage tablets are taken two or three times daily. The extended-release form, Glucophage XR, is available for once-daily dosing. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

radiculopathy, and no evidence of a sensory or motor deficit could do the activities that I outlined in the RFC.

R. 643.

Dr. Griffin admitted that there was a medical note (by Physician's Assistant Gaston) dated January 18, 2006, of "early evolving right S1 radiculopathy," but said he could not know if this persisted as there were no other findings in the records. R. 644-645. Dr. Griffin said that the medications that Plaintiff takes might prevent him from working in a full-time capacity, but this was not documented in the records. R. 647. Dr. Griffin admitted that after Glucophage was discontinued, Plaintiff was placed on insulin, but said that this had no effect upon his residual functional capacity except for work as a long haul truck driver. *Id.* He said that the switch of medication might indicate an increase or decrease in the severity of diabetes. *Id.*

**Medical evidence presented during the administrative hearing**

On May 28, 2003, Plaintiff had a bilateral L4-L5 laminotomy, medical facetectomy, and foraminatomy. R. 499, 401, 498. While on his first post-operative visit Plaintiff said that his pain had improved, by July 24, 2003, Plaintiff reported that his back pain had "continued to worsen" and he reported difficulties with pain behind both knees. R. 413. On examination, however, straight leg raising was negative for pain, and his strength was undiminished (5/5). *Id.* His lumbar range of motion was "only mildly limited in flexion and moderately limited in extension," and flexion caused some pain. *Id.* Dr. Thomas M. Park, Plaintiff's surgeon, said that he did not feel that Plaintiff had

"any true radicular signs," but an EMG[5] was ordered.  *Id.*  Plaintiff was started on

Flexeril and Elavil for pain, and was given a prescription for physical therapy, including

hydrotherapy and a water treadmill.  *Id.*  Dr. Park said:

> [T]here is some question as to his seeking pain medications.  At this point
> I feel he needs to work through his back problems with physical therapy
> and exercises, and avoid the use of narcotics.

R. 413.  A copy of the medical note was sent to Steven W. Spence, M.D., Plaintiff's

primary care physician.

On June 18, 2003, 21 days after surgery, Dr. Park again saw Plaintiff.  R. 498.

Plaintiff said that the "pain in his right hip and down that leg is now gone."  *Id.*  Plaintiff

said he did "feel a mild tightness across the lower back but states this loosens up with

movement."  *Id.*  He asked for more pain medication, but Dr. Park changed him from

Vicodin[6] to Ultracet[7] and gave him a prescription for physical therapy.  *Id.*

On July 10, 2003, Dr. Spence made a note to contact Dr. Parks to discuss the

"long-term game plan" for pain management.  R. 481.  In the meantime, he prescribed

---

[5] Electromyogram.  Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[6] Vicodin is a brand name for hydrocodone.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[7] Ultracet is a trademark for a preparation of tramadol hydrochloride and acetaminophen.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.  Ultracet is used to treat moderate to severe pain for a period of five days or less. It contains two pain-relieving agents.  Tramadol, known technically as an opioid analgesic, is a narcotic pain reliever.  Acetaminophen is the active ingredient in the over-the-counter pain remedy Tylenol.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Lortab[8] and thought that Plaintiff would "most likely need a long-term pain contract." *Id.*

Dr. Spence noted that the surgery "did not fix the herniation," and Plaintiff still had

"severe back pain." R. 480. Ultram[9] did not help, and made Plaintiff nervous. *Id.* He

also noted that Plaintiff weighed 260 pounds and was seriously overweight by about 98

pounds. *Id.* Plaintiff has remained about 100 pounds overweight throughout the years

reflected by the medical record. Dr. Spence also noted that Plaintiff smoked 1.5 packs

of cigarettes per day and had done so for 30 years. *Id.*

On July 24, 2003, Dr. Park wrote to Dr. Spence. R. 414. He said that an

examination of Plaintiff "shows no true nerve root signs," but he planned to send him for

an EMG to rule out nerve root impingement. *Id.* Dr. Park said that Plaintiff did have

"multiple levels of facet hypertrophy and arthritic changes in his spine," and he was

"going to need to continue on a home exercise program for the long run." *Id.* Dr. Park

also said that Plaintiff needed to stop smoking and lose weight. *Id.*

On September 17, 2003, Plaintiff was seen by Dr. Spence. R. 481. After

examination, Dr. Spence noted that Plaintiff had lower lumbar back pain, walked with a

---

[8] Lortab is one of the brand names for hydrocodone. PHYSICIANS' DESK REFERENCE (2004), p. 3233. See note 4, *supra.*

[9] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic. PHYSICIANS' DESK REFERENCE (2005).

limp, and had pain on sitting.  R. 482.  Dr. Spence said he would try to stay away from

narcotics in pain management for Plaintiff, and would try Flextra[10] and Neurontin.[11]  *Id.*

On December 4, 2003, Dr. Spence refilled Plaintiff's medications and noted that

he was "still having back and leg pain."  R. 482.  He decided to try Panlor[12] "for back

pain as this is continuing."  R. 483.

On January 16, 2004, Dr. Spence noted on examination of Plaintiff that Plaintiff

had pain in his right lower back and at midline to palpation.  R. 484.  He found that

Plaintiff had pain with a positive straight leg test.  *Id.*  He said Plaintiff responded best to

Lortab, but he planned to refer Plaintiff to Dr. Elzawhary in Panama City and thought

that in the future, Plaintiff would need MS Contin[13] or patches.  *Id.*

---

[10] Flextra is one of the brand names for acetaminophen/phenyltoloxamine. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[11] Neurontin has two standard uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it can be used to relieve the burning nerve pain that sometimes persists for months or even years after an attack of shingles (herpes zoster). PDRhealth™, PHYSICIANS DESKTOP REFERENCE.  It appears that some physicians prescribe it for pain as well.

[12] Panlor contains dihydrocodeine, acetaminophen, and caffeine, and is indicated for relief of moderate to moderately severe pain.  Information obtained from Pamlab, L.L.C., found at:  http://www.pamlab.com/Products,Panlor.

[13] MS Contin, a controlled-release tablet containing morphine, is used to relieve moderate to severe pain.  While regular morphine is usually given every 4 hours, MS Contin is typically taken every 12 hours – only twice a day.  The Kadian brand may be taken once or twice a day.  The drugs are intended for people who need a morphine painkiller for more than just a few days.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On February 19, 2004, Dr. Spence again examined Plaintiff.  R. 485.  Pain at L4-S1 was noted, with "pain at gluteus medius to deep palpation."  *Id.*  Lortab was prescribed.  *Id.*

On August 19, 2004, Dr. Spence again saw Plaintiff.  R. 485.  Plaintiff's chief complaint was a head and chest cold.  R. 486.  There was no examination of his lower back.  *Id.*

On November 11, 2004, Plaintiff returned to Dr. Spence, again with a cold.  R. 487.  Dr. Spence made no findings about Plaintiff's back condition.  R. 488.

On March 4, 2005, Plaintiff returned to Dr. Spence.  R. 488.  Plaintiff said his back was getting worse, and his back and hip had "bothered him considerably."  *Id.*  On examination, Dr. Spence found that Plaintiff had 2+ pitting edema bilaterally of his lower extremities to mid-calf, and puffiness in his hands.  R. 489.  He made no findings as to back pain.

On March 14, 2005, Plaintiff saw Dr. Spence for abdominal pain.  R. 490.  A gallbladder ultrasound was scheduled.  R. 491.

On April 5, 2005, Plaintiff told Dr. Spence that his back was still hurting.  R. 491.  He still had stomach problems.  *Id.*  A colonoscopy was scheduled.  R. 492.

On May 3, 2005, Plaintiff returned to Dr. Spence for refills of his medications.  R. 492.  There were no findings as to back pain.  R. 493.

On July 8, 2005, Plaintiff was examined on a consultative basis by Sam R. Banner, M.D.  R. 449.  Plaintiff weighed 251 pounds.  *Id.*  Plaintiff had no tenderness in his abdomen to palpation.  R. 450.  Dr. Banner said that there was "no pitting edema

noted today." *Id.* Dr. Banner found no paravertebral spasm of Plaintiff's back on

examination, and Plaintiff's range of motion was 70 degrees forward bending, 15

degrees backward bending, 30 degrees lateral flexion bilaterally, and 30 degrees

rotation bilaterally. R. 451. Plaintiff had "pain and stiffness getting on and off [the]

table." *Id.* He was able to walk with a normal step, without deviation from a straight

line, and could do tandem heel to toe satisfactorily, with no evidence of ataxia, but he

could do only a one-half squat. *Id.* Dr. Banner thought that Plaintiff had weakness in

his lower extremities at 4/5. *Id.* Dr. Banner observed that "sitting and supine caused

low back pain." R. 452. He said, however, that muscle tone was normal and there was

no atrophy of any muscle group. *Id.* Dr. Banner's diagnosis was degenerative disc

disease of the lumbar spine, hypertension, peptic ulcer disease by history, osteoarthritis

bilaterally of the hips, elbows, and shoulders, hyperlipidemia, and venous stasis

bilaterally in the lower extremities. *Id.* Dr. Banner concluded: "Patient will need long

term medical care. Patient gave good effort during exam." *Id.*

On October 3, 2005, Plaintiff was seen again by Dr. Spence. R. 424. He

complained of abdominal pain and nausea. *Id.* He said that his musculoskeletal pain

had been reasonably controlled with MS Contin. *Id.* Plaintiff said that he walked around

at night to keep his legs from irritating him. *Id.* Dr. Spence decided to try Klonopin.[14] R.

425.

---

[14] Klonopin is used alone or along with other medications to treat convulsive disorders such as epilepsy. It is also prescribed for panic disorder, that is, unexpected attacks of overwhelming panic accompanied by fear of recurrence. Klonopin belongs to a class of drugs known as benzodiazepines. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On November 3, 2005, Plaintiff returned to Dr. Spence. R. 425. He was 89 pounds overweight. R. 426. He was found to have pain in the right S1 joint. R. 426.

On December 12, 2005, Dr. Spence again saw Plaintiff. R. 427. Plaintiff told Dr. Spence that his hip and back pain were getting worse, and the medication for "restless legs" was not helping. *Id.* He said he had had "progressive" hip and back pain. *Id.* MS Contin had helped, but lasted only 6-8 hours, not 12 hours. *Id.* On examination, Plaintiff's spine, ribs, and pelvis were observed to be the "same as previous exams." *Id.* Dr. Spence said that he would refer Plaintiff "back to surgery," and would increase the MS Contin. R. 428. He continued Lortab, and discontinued Klonopin. *Id.* Requip[15] was given for restless leg syndrome. *Id.*

On January 5, 2006, Dr. Spence saw Plaintiff for a checkup and refills of medications. R. 377. Lumbar pain was noted. *Id.* The increase in the dose of morphine had helped. *Id.* Lumbar back pain was noted on the left, without change was the objective finding. R. 378. A referral to "surgery" was made. *Id.*

On January 18, 2006, Melvin Gaston, Physician's Assistant for Dr. Park, reexamined Plaintiff for Dr. Park. R. 411-412. Plaintiff told P.A. Gaston that he "had significant pain in his lower back that has been gradually progressive over the past six years despite the surgery." R. 411. Plaintiff said he had had a "momentary" improvement after surgery. *Id.* Plaintiff described the pain in his lower back and his right lumbosacral paraspinals as 8 on a scale of 10. *Id.* Plaintiff said that he had "some

---

[15] Requip is used to help relieve the signs and symptoms of Parkinson's disease. It is also used to treat restless legs syndrome (RLS). PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

posterior radiation through the right hamstrings and no pain distal of the knee." *Id.* The pain was aching and affected his sleep. *Id.* Plaintiff said that the symptoms were aggravated with sitting, standing, walking, and other movement. *Id.* As prescribed by Dr. Spence, he had been taking Lortab 7.5 mg two or three times a day, and MS Contin. *Id.* Plaintiff said that he had had physical therapy several years earlier, in Ohio, but he had not done physical therapy since his surgery in 2003. *Id.* Plaintiff said that he had smoked two packs of cigarettes a day for 30-35 years. *Id.* P.A. Gaston "advised as to the effects of nicotine on the spine" and encouraged Plaintiff to stop immediately. *Id.* Plaintiff still weighed 250 pounds, and is 6 feet tall. *Id.* On examination, P.A. Gaston made the following findings:

> Examination of the thoracolumbar spine reveals 1+ palpable tenderness in the soft tissues over the right gluteal and in the right PSIS areas. He has mild palpable tenderness around the lumbosacral junction and just to the right of the midline lumbar incision. His stance is neutral without obvious tilt or list. Flexion is good with fingertips achieving just above the level of his ankles. This only brings out a modest amount of posterior stretch. Extensions is somewhat limited and found to be 1+ painful in the lumbosacral areas when attempted. Lateral bends in either direction are benign. Facet extension is negative. No obvious lumbar instability and the paraspinals are strong.

> Both lower extremities reveal no significant palpable tenderness. He does have 1+ tenderness in the hamstrings with straight leg raising. Straight leg raise on the right elicits 2+ pain in the right PSIS area of approximately 70 degrees. Negative straight leg raising on the left. No obvious instability or limited range of motion of the major joints of each leg on testing. Motors are found to be string [sic, strong?] at multiple levels tested in both lower limbs. Toe walk is subjectively strong.

> Neurological examination reveals symmetrically absent reflexes of the knees and ankles. Babinskis are bilaterally negative. Sensory examination to light touch is grossly intact. Balance and coordination are normal. He is oriented times three. Mood is appropriate.

R. 411-412. P.A. Gaston examined x-rays showing "significant facet arthropathy at L4-L5 and L5-S1." R. 412. He said that "lateral osteophytes are noted in the lower lumbar regions." *Id.* He found that Plaintiff had "appropriate disc heights." *Id.* His diagnosis was: "Lumbar degenerative disc disease with myofascial component and possible early evolving right S1 radiculopathy." *Id.* P.A. Gaston recommended that Plaintiff begin physical therapy and return in four weeks. *Id.* If Plaintiff was not better, he said they would consider an MRI to see if he "might be amenable to invasive treatment modalities." *Id.* A copy of the report was sent to Dr. Spence. *Id.*

On February 20, 2006, Plaintiff was seen by Dr. Spence. R. 378-379. No current findings about his back pain were made. *Id.* On March 2, 2006, Plaintiff reported that he had continued low back pain. R. 380. No findings from examination were made. *Id.* No findings about back pain were made by Dr. Spence on April 6, 2006, either. R. 381-382.

On April 21, 2006, Plaintiff reported to Dr. Spence that he had no joint or back pain, and no myalgias, and there were no objective findings of any back pain. R. 383. On May 2, 2006, Plaintiff said he felt good and Dr. Spence made no findings of back pain. R. 384. On June 5, 2006, Plaintiff said his back was "still bothering him," but Dr. Spence reported no objective findings. R. 385-386.

On August 3, 2006, Plaintiff told Dr. Spence that he felt good, and he had no joint pain, no back pain, and no myalgias. R. 387.

On October 18, 2006, Plaintiff told Dr. Spence that he had severe "RLS [restless leg syndrome], pain in left knee." R. 388. Pain was noted on examination in Plaintiff's

left knee. *Id.* There was no mention of back pain. *Id.* Dr. Spence ordered an x-ray of Plaintiff's knees. *Id.* On November 6, 2006, Dr. Spence examined both of Plaintiff's legs and found them to be normal, but his assessment was knee pain. R. 389. On November 21, 2006, Dr. Spence found "mild crepitance [sic, crepitus or crepitation] at left knee with ROM." R. 391. He injected the left knee with Kenalog[16] and Lidocaine.[17] *Id.*

On January 4, 2007, Plaintiff told Dr. Spence that he felt bad, that he had a tender spot at the left upper arm that was painful at night. R. 392. There was no mention of back pain and no findings of back pain. *Id.* An x-ray of the humerus was normal. *Id.* Dr. Spence injected Plaintiff's left triceps with Kenalog and Lidocaine. *Id.*

On January 8, 2007, Plaintiff told Dr. Spence that his right knee was "killing him." R. 393. There was no mention of back pain. *Id.* Dr. Spence noted mild pain at the right knee with some crepitus. *Id.* He injected the knee. *Id.*

On February 6, 2007, Plaintiff returned to Dr. Spence. R. 394. He told Dr. Spence that he felt bad. *Id.* He did not mention back pain, and Dr. Spence did not find that he had back pain. *Id.* Dr. Spence found, however, that Plaintiff had "subjective hyperesthesia in right T7/T8 distribution." *Id.*

On March 5, 2007, Dr. Spence saw Plaintiff. R. 396. Plaintiff said that he felt bad. *Id.* He did not, however, report that he had back pain and Dr. Spence made no

---

[16] Kenalog is a trademark for preparations of triamcinolone acetonide, an antiinflammatory glucocorticoid. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[17] Lidocaine is an anesthetic with sedative, analgesic, and cardiac depressant properties. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

findings of back pain.  *Id.*  There was no mention of back pain on March 26, 2007,

March 27, 2007, and April 2, 2007, either, though the purpose of those visits had

nothing to do with back pain.  R. 397-399.  On April 3, 2007, however, Dr. Spence said

that Plaintiff had low back pain, "no great change," and felt bad.  R. 399.  He made no

objective findings about back pain, however, and he said that Plaintiff "seems to be

doing well."  R. 400.  On May 3, 2007, and on June 4, 2007, Plaintiff told Dr. Spence

that he felt good, and he had no joint pain, no myalgias, and no back pain.  R. 401-402.

On the latter date, Dr. Spence discontinued Glucophage due to side effects.  R. 403.

On May 30, 2007, Plaintiff was examined by Jose Urdaneta-Jaimes, M.D., for a

sleep study.  R. 347.  Plaintiff reported that he had trouble going to sleep due to

breathing problems and leg pain.  *Id.*  Plaintiff did not mention back pain.  *Id.*  Dr.

Urdaneta noted that Plaintiff had been diagnosed with restless leg syndrome.  *Id.*  It was

noted that Plaintiff had a significant nasal septal deviation, probably congenital.  *Id.*  In

the review of systems, Plaintiff reported fatigue, anxiety, sleep disturbance, back pain,

and joint stiffness.  *Id.*  He said he was smoking a pack of cigarettes a day.  R. 348.  On

examination, Plaintiff was found to have normal gait, grossly normal tone, and normal

muscle strength.  *Id.*  There was no finding of back pain.  *Id.*  His neurological

examination was normal.  R. 348-349.  A sleep study was ordered.  R. 349.  It was

noted that Plaintiff needed to have the basal cell skin cancer on his nose removed.  *Id.*

On July 2, 2007, Plaintiff saw Dr. Spence.  R. 404.  He told Dr. Spence that he

was depressed and felt bad because his second daughter had just passed away.  R.

404. There was no notation of back pain by Dr. Spence. *Id.* The diagnosis was transient adjustment disorder and depression. *Id.*

On July 6, 2007, Dr. Urdaneta wrote to Dr. Spence that the sleep study had been conducted. R. 350. His diagnosis was severe obstructive sleep apnea-hypopnea, with the presence of very frequent obstructive apneas and hypopneas. *Id.* He recommended treatment using a nasal CPAP. *Id.* He directed Plaintiff to return for a CPAP titration.[18] *Id.* He also said: "If clinically indicated, the patient should also consider weight reduction . . . ." *Id.*

On July 20, 2007, Dr. Spence said that while Plaintiff said that he felt bad, he had no joint or back pain, and no myalgias. R. 405. He remained depressed and was taking Cymbalta.[19]

On August 6, 2007, Plaintiff had a followup visit with Dr. Urdaneta. R. 352. He was found to be "still very symptomatic." *Id.* It was noted that Plaintiff had evidence of "severe" obstructive sleep apnea during the study, "with severe oxygen desaturations." R. 353. He was given a prescription for CPAP. *Id.* Among the treatment recommendations was a recommendation that Plaintiff "get regular exercise" and lose weight. R. 354.

---

[18] Titration is a method or the process of determining the concentration of a dissolved substance in terms of the smallest amount of a reagent of known concentration required to bring about a given effect in reaction with a known volume of the test solution. MEDLINE PLUS (MERRIAM-WEBSTER). Here it is used to indicate the process of adjusting the CPAP device.

[19] Cymbalta is used to treat major depression and diabetic neuropathy, a painful nerve disorder associated with diabetes that affects the hands, legs, and feet. Cymbalta is also used to treat generalized anxiety disorder and fibromyalgia. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

In the period from August 6, 2007, to August 22, 2007, Plaintiff used the CPAP only 23.5% of the 17 days.  R. 357.  His cumulative usage was only 17 minutes.  *Id*. This failure to use the CPAP device occurred several months before Plaintiff had surgery on his nose.

On September 10, 2007, Dr. Spence noted that Plaintiff had two large basal cell skin cancers on his nose.  R. 406-407.  He said he felt bad.  *Id*.  There was no finding that he had back pain.  *Id*.  On October 4, 2007, Plaintiff again said he felt bad.  R. 408. He said that the left knee injection had helped for several months.  *Id*.  There was no mention of any complaint or findings of back pain.  *Id*.  On November 1, 2007, Plaintiff was found to have pain in his left arm.  R. 409.  The diagnosis was tennis elbow.  *Id*. There was no mention of back pain.  *Id*.

On November 6, 2007, Plaintiff had Mohs' micrographic surgery on his nose to remove the skin cancers.  R. 364.  He was referred to Dr. Harper for plastic surgery reconstruction.  *Id*.

Plaintiff returned to Dr. Urdaneta on November 20, 2007.  R. 355.  Plaintiff reported that he thought that the CPAP needed to be adjusted because he had a burning sensation in his nose and sinuses for two weeks after using the machine, and he could not get it to seal.  *Id*.  There was no mention of any difficulty using the CPAP due to surgery on Plaintiff's nose to remove the skin cancer.  R. 356.  There were no findings of back pain on examination.  *Id*.

On December 1, 2007, Dr. Spence filled out a "Medical Source Statement of Ability to Do Work-Related Activities."  R. 342.  He said that he thought that Plaintiff

could lift occasionally less than 10 pounds, could stand for less than two hours in an eight hour day, and could sit for less than six hours in an eight hour day.  R. 342-343. He said that the reason for this was that Plaintiff had "severe progressive lumbar disc disease," and was status post lumbar surgery in 2003.  R. 343.  He said that Plaintiff had "significantly impaired mobility" and "cannot stand or sit [greater] than 10 minutes at a time without pain."  *Id.*  He said that as a consequence, Plaintiff could never climb, balance, kneel, crouch, or stoop.  *Id.*  Dr. Spence said that Plaintiff could only occasionally reach, handle, finger, or feel due to radiculopathy in his lower extremities and peripheral neuropathy.  R. 344.  He said that Plaintiff would be absent from work more than three times a month due to these health problems.  R. 345.

**Medical evidence presented to the Appeals Council**

On November 24, 2008, Plaintiff submitted a more detailed statement by Dr. Spence to the Appeals Council.  R. 599.  The Appeals Council stated that it had considered this additional evidence, but found that the information did not provide a basis for changing the ALJ's decision.  R. 6-7.  The Appeals Council denied Plaintiff's request for review.  R. 6.

Dr. Spence's letter (dated October 27, 2008) addresses questions that were directed at Dr. Griffin's opinion.  R. 601-604.  Dr. Spence states in this letter that he had known Plaintiff since 2003, and was "quite familiar with his condition."  *Id.*  He states that an objective conclusion about Plaintiff's impairments "based solely on my practice notes is absurd as I do not purport to be an expert in orthopedic medicine."  *Id.*  Dr. Spence said that he was not "a disability physician and did not formally evaluate Mr.

Keene in this regard, nor in the detail required [to] pass absolute judgment as to his

physical capabilities." *Id*. Dr. Spence states:

> A more rational approach would be for Dr. Griffin to make decisions based
> on the entirety of his medical documentation, not just conveniently
> ignoring the work of the involved specialists. In fact, Mr. Keene has had a
> thorough disability assessment performed on 7/28/05 by Dr. Sam Banner
> – despite its age, it was unfortunately ignored. I have based much of my
> clinical assessment and opinions on specialist evaluation and also on my
> 54 visits with this patient over a five year span. I understand his condition
> and his multiple comorbidities.

R. 601.

Dr. Spence was asked to address Dr. Griffin's observation that there was "no

documentation in the records of radiculopathy, motor or sensory deficits, and the

records are mostly 'filler.' " R. 603. Dr. Spence explained that he did not do a detailed

examination of Plaintiff on each encounter because he was mostly managing pain and

co-morbid conditions. R. 601. He said that his data, presumably upon which he relied

to reach his opinion about Plaintiff, "was obtained from specialist referral." *Id*. He said

that he was never asked to do any type of disability examination, but could assure the

reader that Plaintiff "suffers from chronic pain status post his lumbar surgery despite any

neuralgic findings." *Id*.

When asked to comment on Dr. Griffin's thought that Plaintiff's possible S1

radiculopathy did not persist after January 18, 2006, because the condition was not

mentioned again in the medical records, R. 603, Dr. Spence said that "though not

routinely mentioned in each note, the right S1 radiculopathy did not improve over time."

R. 601. He said that Plaintiff continued to have symptoms, and thus he made changes

to the amounts of the pain medication and attempted to refer Plaintiff to specialist care. *Id.*

Dr. Spence referred to Dr. Griffin's opinion that narcotic pain medications were not indicated, and were harmful to Plaintiff's sleep apnea, as "ludicrous." R. 601. He said that Plaintiff was treated with narcotics "well before a diagnosis of sleep apnea was confirmed." *Id.* Dr. Spence said that he "never suggested that pain meds were the best option, but a logical one based on the progressive nature of his problem. . . . Having seen the patient, I think it is ridiculous to presume narcotics are not indicated." *Id.*

Dr. Spence said that whether Plaintiff's excuses for not using the CPAP were "reasonable" was a matter for debate because 40% or more of patients are non-compliant with their CPAP devices. *Id.* He said that Dr. Griffin was correct that the CPAP "may alleviate some of the patient's symptoms, but this cannot be presumed to be the case in all situations." *Id.* Dr. Spence said that Dr. Griffin's statement that Plaintiff's mood disorder would be ameliorated if Plaintiff used the CPAP device was "possibly true, but may be wishful thinking." R. 602.

Dr. Spence said that Plaintiff "had a reasonable tolerance to his medications," i.e., he did not have adverse side-effects. R. 602. He said he might suffer sleepiness. *Id.*

Dr. Spence explained that he discontinued Glucophage for treatment of Plaintiff's diabetes because it caused diarrhea. R. 602. He said that the change to insulin generally represents a failure of the previous therapy. *Id.* He said that the change was due to poor control of diabetes in December, 2007. *Id.*

When asked whether Plaintiff has peripheral neuropathy and how did Dr. Spence diagnosis this condition, Dr. Spence said:

> Mr. Keene suggests numbness and tingling of the feet. He has had monofilament testing that showed subjective decreased sensation. Unfortunately, this is not documented. Given symptoms of paresthesias coupled with a diagnosis of diabetes mellitus, it is reasonable to conclude that the patient has diabetic neuropathy, even with a negative examination. It is certainly not reasonable or necessary to perform NCV studies on all diabetics with burning feet and will generally not change my medical management at all.

R. 602.

Finally, Dr. Spence was asked to comment on Dr. Griffin's conclusion that the medical records do not support the degree of limitation described by Dr. Spence. R. 604. In response, Dr. Spence said:

> I disagree. Mr. Keene exhibits tremendous amounts of pain and can hardly sit long enough for a fifteen minute office visit (in fact, he cannot). Based on my observations and those of his previous disability examiner and specialists, I think he certainly has considerable physical limitations. Perhaps a more thorough, more up-to-date examination by a disability physician would have been more appropriate as opposed to reliance on his family practitioner[']s notes alone.

R. 602.

**Legal analysis**

**Whether the Appeals Council erred in failing to reverse the ALJ's decision or to address Dr. Spence's opinion**

Plaintiff argues that the response by Dr. Spence to the opinion of Dr. Griffin should have been discussed by the Appeals Council. Plaintiff correctly points out that "when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits

erroneous." Ingram v. Commissioner of Social Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). Plaintiff argues that the Appeals Council erred because it provided no rationale to support its conclusion that the new evidence from Dr. Spence, Plaintiff's treating physician, did not render the denial of benefits erroneous. Doc. 19, p. 8. Plaintiff argues that this is so because it is the law in this circuit that when the Commissioner fails to articulate reasons for failing to give substantial weight to the opinion of a treating physician, this court must rule that that the opinion must be accepted as true. Plaintiff cites Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991) for this rule.

Defendant argues that when the Appeals Council considers new evidence but denies review, it is not required to articulate its reasons for denying review. Cited for this is Damato v. Sullivan, 945 F.2d 982, 988 (7th Cir. 1991), which so held. Other courts have held that the Appeals Council must articulate the basis for its conclusion that the new evidence does not change the decision, reasoning that otherwise, there is nothing for the court to review. Scott ex rel. Scott v. Barnhart, 332 F.Supp.2d 869 (D. Md. 2004) and cases cited.

Plaintiff's argument is logically based on settled principles of administrative law. The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated by the Commissioner. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is

reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)

(emphasis added).  "Where the *Secretary* has ignored *or* failed properly to refute a

treating physician's testimony, we hold as a matter of law that he has accepted it as

true."  *Id.* (emphasis added);  Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217

(11th Cir. 1991).

Here, the ALJ decided that Dr. Spence's opinion was entitled to little weight

because it was conclusory.  R. 27.  It *was* conclusory at the time that the ALJ conducted

his review, and, as will be discussed ahead, it was not supported by Dr. Spence's own

treatment notes or the treatment notes of the specialists.  But Dr. Spence then provided

an opinion that is much more detailed and the Appeals Council, on behalf of the

Commissioner, considered it.  If that expanded opinion is still not entitled to be given

substantial weight *by the Commissioner*, the Appeals Council (or the ALJ on remand)

should have said why.  Otherwise, the rule established by Elam and like cases cannot

be applied, and this court is faced with *post hoc* reasoning by the attorney for the

Commissioner, which is not the proper procedure for review of administrative action.

On administrative review of an action of an agency of the Executive Branch, this court

may not "substitute counsel's *post hoc* rationale for the reasoning supplied by the"

agency itself.  N.L.R.B. v. Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1,

121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ.,

444 U.S. 672, 685, n. 22, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and

Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91

L.Ed. 1995 (1947)[20]); Real v. Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying

rehearing of Real v. Simon, 510 F.2d 557 (5th Cir. 1975)); Golembiewski v. Barnhart,

322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir.

2001).

However, it has also been held that:

While we may not supply a reasoned basis for the agency's action that the
agency itself has not given [citing Chenery Corp.], we will uphold a
decision of less than ideal clarity if the agency's path may reasonably be
discerned.

Manasota-88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir. 1986).

In all of the cases implementing Ingram, all unpublished, the Eleventh Circuit has

undertaken its own review of  the entire record to determine "whether that new evidence

renders the denial of benefits erroneous."  See, e.g., Poellnitz v. Astrue, 349 Fed.Appx.

500 (11th Cir. Oct 21, 2009) (Table, text in WESTLAW, NO. 09-11862); Smith v. Social

Security Admin., 272 Fed.Appx. 789 (11th Cir. Apr 03, 2008) (Table, text in WESTLAW,

NO. 07-13022); Couch v. Astrue, 267 Fed.Appx. 853 (11th Cir. Feb 29, 2008) (Table,

text in WESTLAW, NO. 07-13036); Robinson v. Astrue, 2010 WL 582617 (11th Cir. Feb

------

[20] Chenery Corp. held:

When the case was first here, we emphasized a simple but fundamental
rule of administrative law.  That rule is to the effect that a reviewing court,
in dealing with a determination or judgment which an administrative
agency alone is authorized to make, must judge the propriety of such
action solely by the grounds invoked by the agency.  If those grounds are
inadequate or improper, the court is powerless to affirm the administrative
action by substituting what it considers to be a more adequate or proper
basis.  To do so would propel the court into the domain which Congress
has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

19, 2010) (Table, text in WESTLAW, NO. 09-12472); <u>Barclay v. Commissioner of Social Sec. Admin.</u>, 274 Fed.Appx. 738, (11th Cir. Mar 12, 2008) (Table, text in WESTLAW, NO. 07-12960).   It appears, therefore, that the Eleventh Circuit has implemented <u>Ingram</u> by asking, upon review of all of the evidence (including the new evidence), whether the Commissioner's path to his decision may be reasonably discerned.  If it can be discerned, then the court must determine whether the decision is supported by substantial evidence.

For these reasons, the more technical claim presented by Plaintiff in the first issue should be rejected.  This, then, necessitates that the next issue be recast into the terms set forth by <u>Ingram</u>.

### Whether the new evidence from Dr. Spence, a treating physician, renders the denial of benefits erroneous

The new evidence from Dr. Spence is important primarily because Dr. Spence concluded from 54 visits with Plaintiff that Plaintiff's residual functional capacity is significantly impaired by severe pain.  Dr. Spence rather candidly admitted, however, that he did not make objective, clinical findings and record those findings in his medical notes.  He said that he did not perform objective tests to determine the degree of Plaintiff's pain on movement, and he admitted that he did not have clinical findings to support a diagnosis of radiculopathy (from spinal impairment) or peripheral neuropathy (from diabetes mellitus).  Dr. Spence said that he relied instead upon his unrecorded observations of pain behaviors by Plaintiff and findings in the record from the specialists to whom he had referred Plaintiff.

The lack of objective support in Dr. Spence's medical records is legally significant for this court's review. This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d at 1240-1241); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory."). *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

On a number of occasions in 2006 and 2007, Dr. Spence found that Plaintiff had no joint pain, no back pain, and no myalgias. R. 383 (April 21, 2006); R. 387 (August 3, 2006); R. 402 (May 3, 2007); R. 401 (June 4, 2007); R. 405 (July 20, 2007). Perhaps this was because the pain medications were working. Dr. Spence did not note at any point that Plaintiff suffers adverse effects from his medications, and admitted in the most recent letter that Plaintiff does not suffer any adverse effects from the pain medication that he takes. R. 602. If Plaintiff in fact could not sit in Dr. Spence's office due to pain, one would have thought that Dr. Spence would have so noted this in his records, and would have referred Plaintiff to other specialists for further evaluation and an MRI.

Dr. Spence cautioned that he was not an expert in disability determinations, and he said that he relied upon the findings of specialists, particularly the findings of Dr. Banner. The findings of the specialists of record, Drs. Banner, Park, and Gaston, do not

support Dr. Spence's conclusions. On July 8, 2005, Dr. Banner noted that Plaintiff had no paravertebral spasm and Plaintiff's range of motion was only mildly restricted (70 degrees forward bending, 15 degrees backward bending, 30 degrees lateral flexion bilaterally, and 30 degrees rotation bilaterally). R. 451. Although Plaintiff had "pain and stiffness getting on and off [the] table," and had low back pain from sitting and in a supine position, Plaintiff was able to walk with a normal step, without deviation from a straight line, and could do tandem heel to toe satisfactorily, with no evidence of ataxia. R. 451-452. Further, Dr. Banner found that Plaintiff had only some (4/5) weakness in his lower extremities, his muscle tone was normal, and there was no atrophy of any muscle group. R. 452. These findings are consistent with the residual functional capacity assigned by Dr. Griffin to Plaintiff, a residual functional capacity that acknowledges that while Plaintiff is limited by that pain, he still has muscle strength and spinal flexibility.

The evidence from other specialists likewise is not significantly supportive of Dr. Spence's residual functional capacity opinion, and is consistent with Dr. Griffin's conclusions. On May 28, 2003, right after the surgery, Plaintiff's surgeon, Dr. Park, examined Plaintiff and found that straight leg raising was negative for pain and Plaintiff's strength was undiminished (5/5). R. 413. *Id.* Dr. Park also found that Plaintiff's lumbar range of motion was "only mildly limited in flexion and moderately limited in extension," though flexion caused some pain. *Id.* Dr. Park said that he did not feel that Plaintiff had "any true radicular signs." Dr. Park said:

> there is some question as to his seeking pain medications.  At this point I
> feel he needs to work through his back problems with physical therapy
> and exercises, and avoid the use of narcotics.

R. 413.

On January 18, 2006, several years later, P.A. Gaston performed a thorough

examination of Plaintiff and his findings also do not show disability to the extent found

by Dr. Spence.  R. 411-412.  Though P.A. Gaston noted "possible early evolving right SI

radiculopathy," R. 412, as Dr. Griffin noted, he did not definitively determine the

existence of radiculopathy and there is nothing else in the medical record about

radiculopathy.  Like Dr. Park, P.A. Gaston ordered that Plaintiff attend physical therapy.

R. 412.  P.A. Gaston also recommended that Plaintiff cease smoking tobacco

immediately, and he explained how nicotine caused adverse effects for Plaintiff's spine.

R. 412.

On May 30, 2007, Plaintiff was examined by Jose Urdaneta-Jaimes, M.D., for a

sleep study.  R. 347.  While Dr. Urdaneta was focused upon treatment of Plaintiff's

sleep apnea, he conducted a physical examination of Plaintiff and found that Plaintiff

had normal gait, grossly normal muscle tone, and normal muscle strength.  R. 348.

There was no finding of back pain.  *Id.*  Dr. Urdaneta said that the neurological

examination was normal.  R. 348-349.  In a follow-up visit, Dr. Urdaneta also

recommended that Plaintiff exercise and lose weight.  R. 354.

In summary, all of the specialists recommended that Plaintiff attend physical

therapy.  This indicates that they thought that Plaintiff was capable of performing

physical therapy and perhaps he would have also lost weight doing physical therapy.

But Plaintiff did not attend physical therapy, and indeed, said he had not taken any physical therapy. R. 662-663. Had Plaintiff attended physical therapy and failed due to physical inability, there would be a record of that. Had he attended and his condition improved, there would be a record of that. As it stands, Plaintiff did not attend physical therapy and his treating physician, his surgeon, had prescribed physical therapy as a way to heal more quickly. This evidence is adverse to Plaintiff's claim.

Defendant also points out that Plaintiff had earnings of over $9,000 in 2004, working for Flat Creek Transportation LLC. R. 122, 115. This was in the year after his surgery. These earnings are very similar to Plaintiff's earnings in 1984, 1989, and 1990, and more than Plaintiff's earnings in 1999, 1998, 1997, 1996, 1991. R. 122. While this evidence was not mentioned by the ALJ to support his decision, it may now be considered as this court considers the whole record. This is evidence supportive of Dr. Griffin's conclusions, and adverse to the conclusions of Dr. Spence.

In summary, the new evidence from Dr. Spence does not render the denial of benefits erroneous. The decision to deny benefits can be discerned from the record and is supported by substantial evidence.

**Whether the ALJ erroneously rejected the opinion of Dr. Spence**

The final issue posed by Plaintiff is moot in light of this court's review of the decision of the Appeals Council.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The

decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on May 20, 2010.


s/     **William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**